**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

**UNITED STATES OF AMERICA,**

　　　　**Plaintiff,**　　　　　　　**Case No. 3:18-cr-41-J-25PDB**

　　　　**vs.**

**WILLIAM CARL KLEYLA,**

　　　　**Defendant.**

## DEFENDANT'S SENTENCING MEMORANDUM

WILLIAM CARL KLEYLA, through undersigned counsel, respectfully submits this Sentencing Memorandum, along with the attached exhibit, for this Honorable Court's consideration in determining an appropriate sentence for his crime. For the reasons that follow, Mr. Kleyla requests that this Court impose a sentence of probation.

### I.　　INTRODUCTION

Mr. Kleyla pled guilty to one count of trafficking in counterfeit goods in violation of 18 U.S.C. § 2320(a). (Doc. 22; Doc. 24). Mr. Kleyla takes full responsibility for this crime, which is unquestionably a serious offense.

Nevertheless, there are a number of compelling facts and circumstances that mitigate Mr. Kleyla's culpability. The charged offense is a non-violent crime. In

addition, Mr. Kleyla has no criminal history whatsoever.  Given his age and education, he poses virtually no risk of recidivism.  Finally, his strong familial bonds, his support from the community, and the probationary sentences imposed across the country for similarly-situated defendants all weigh in favor of a sentence of probation in this case.  Such a sentence would be sufficient, but no greater than necessary, to satisfy the goals of sentencing as codified at 18 U.S.C. § 3553(a)(2).

## II.   SENTENCING GUIDELINES CALCULATION

The Probation Office arrived at an offense level of 15 with a criminal history score of zero. (PSR at ¶¶ 33, 36).  Mr. Kleyla's range of imprisonment under Probation's calculation would be between 18 and 24 months.  (PSR at ¶ 63).  Mr. Kleyla has no objection to the calculation of his offense level or his criminal history. Mr. Kleyla does, however, object to paragraph 68 of the presentence investigation report insofar as it states that "the defendant is ineligible for probation" pursuant to U.S.S.G. § 5B1.1 comment n.2.

a) Objection to Paragraph 68 – Mr. Kleyla can receive a term of probation notwithstanding § 5B1.1 comment n.2.

Although § 5B1.1 comment n.2 suggests that a sentence of probation is inappropriate for a defendant situated in Zone D of the Sentencing Table, that does not mean that a defendant is categorically ineligible for non-custodial term of probation.  *See Gall v. United States*, 552 U.S. 38, 46-50 (2007) (district court did not abuse its discretion when it sentenced a defendant to 36 months of probation

2

notwithstanding guidelines recommendation of 30 to 37 months of imprisonment); *see also United States v. Duhon*, 541 F.3d 391, 394 (5th Cir. 2008) (in a child pornography case, affirming the substantive reasonableness of five-year probationary sentence where the Guidelines range was 15 to 21 months, despite prohibition against probationary sentences under § 5B1.1, comment n.2); *United States v. Autrey*, 555 F.3d 864 (9th Cir. 2009) (in a child pornography case, affirming five-year probationary sentence where the Guidelines range was 41 to 51 months).

*Gall* illustrates that a term of probation is an available sentence under the advisory guidelines.  Brian Gall was a sophomore at the University of Iowa when he befriended Luke Rinderknecht, who got Gall into selling ecstasy.  *Id.* at 41.  Over the course of seven months, Gall made over $30,000 selling the drug.  *Id.*

Gall pled guilty, and, although his PSR recommended a sentencing range of 30 to 37 months of imprisonment, the district court sentenced him to a term of probation.  *Id.* at 43.  The Eighth Circuit reversed the decision, finding that the departure from 30 months was "extraordinary" because it amounted to "a 100% downward variance," that was not supported by "extraordinary circumstances."  *Id.* at 45.

On certiorari review, the United States Supreme Court squarely rejected the holding of the Eighth Circuit.  *Id.* at 46.  It concluded that there was no requirement that "extraordinary circumstances" exist for the imposition of a sentence below the

3

guidelines range.  *Id.* at 47.  The *Gall* Court also approved of the imposition of a probationary sentence: "We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty."  *Id.* at 48.

The Supreme Court affirmed the logic of the district court judge, who recognized that a term of probation is not "an act of leniency," but instead is a "substantial restriction of freedom."  *Id*. at 44.  The Supreme Court described the onerous conditions inherent in a term of probation: "Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking."  *Id.* at 48.

In sum, the Supreme Court held that the district court did not abuse its discretion when it imposed a probationary sentence notwithstanding the guideline recommendation of a substantial term of imprisonment.  Therefore, under *Gall*, this Court has discretion to sentence Mr. Kleyla to a term of probation.

b) Paragraph 77 – Multiple factors not mentioned in the PSR may warrant a downward departure or variance.

Although the PSR mentions substantial assistance as a potential ground for

4

departure, other grounds also exist.  Mr. Kleyla will discuss those grounds in turn in the section that follows.

### III.   REQUEST FOR DOWNWARD DEPARTURE OR VARIANCE

Mr. Kleyla respectfully requests that this Court enter a downward departure or variance based upon his specific characteristics and the facts of this case. Specifically, Mr. Kleyla asks that the Court impose a sentence of probation.

a) The Post-Booker Sentencing Framework

In the wake of *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines are advisory only.  Judges now have power to impose sentences that are *no greater than necessary* to satisfy the statutory purposes of sentencing, to consider all of the characteristics of the offender and circumstances of the offense, and to reject advisory guidelines that are not based on national sentencing data and empirical research. *See Booker*, 543 U.S. 220; *Rita v. United States*, 127 S.Ct. 2456 (2007); *Gall v. United States*, 552 U.S. 38, 50 (2007); *Kimbrough v. United States*, 128 S.Ct. 558 (2007).  A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," but the court "*may not* presume that the Guidelines range is reasonable.*" Gall v. United States*, 552 U.S. 38, 50 (2007) (emphasis added).

A district court has the discretion to conclude that the resulting advisory range "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in

a mine-run case." *Kimbrough*, 128 S.Ct. at 575 (2007).   Though this Court is required to consider the factors under 18 U.S.C. § 3553(a) set forth below, it need not accept the "utter travesty of justice that sometimes results from the Guidelines' fetish with abstract arithmetic."  *United States v. Adelson*, 441 F.Supp. 2d 506 (S.D.N.Y. 2006).

In other words, after *Booker*, this Court is unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 552 U.S. at 53 (quoting *Koon v. United States*, 518 U.S. 81 (1996)). In fact, the use of the Guidelines in any manner other than an advisory function violates the defendant's Sixth Amendment rights.  *Booker*, 543 U.S. at 244-45 (Part Two, Breyer, J.).

   b) The Court should grant a downward departure under U.S.S.G. § 2B1.1 because the offense level determined under this guideline substantially overstates the seriousness of the offense.

The primary component of the offense conduct was the loss amount, which was calculated based on the loss amount table contained in U.S.S.G. § 2B1.1.  (PSR at ¶ 24).  However, the comment to that Guidelines provision states: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases, a downward departure may be warranted."   U.S.S.G § 2B1.1 cmt. n. 20(c).

The Guidelines' recommendation in this case substantially overstates the seriousness of Mr. Kleyla's offense.  This is a non-violent crime that poses no threat to human life or safety.  Indeed, the infringement of trademarks is commonly associated with private, civil enforcement, rather than the imposition of criminal sanctions, and the criminal sanctions enacted under the Trademark Counterfeiting Act of 1984, 18 U.S.C. § 2320, were originally intended to impose criminal liability on only those who engaged in "particularly egregious conduct—not in ordinary cases of trademark infringement."   Mark P. McKenna, *Criminal Trademark Enforcement and the Problem of Inevitable Creep*, 51 AKRON L. REV. 989, 992 (2017).   Professor McKenna persuasively argues that "doctrinal creep" in the enforcement of this law has led to unjustified punishment that is "divorced from the most significant justifications of criminal liability."  *Id.*

Furthermore, as noted in the Presentence Investigation Report, the "various corporations *did not incur a loss in this case as nothing was directly taken from them*." (PSR at ¶ 73) (emphasis added).   Thus, unlike most theft, property destruction, and fraud offenses, the loss amount calculation here is not derived from the amount of loss the victim suffered or the amount of loss the defendant intended to cause, and so the reliance on loss amount calculations associated with those other economic crimes tends to overstate the seriousness of this offense.  *See generally* Serge Subach, *Criminal Copyright Infringement: Improper Punishments from an*

*Improper Analogy to Theft*, 40 New Eng. J. on Crim. & Civ. Confinement 255, 256 (2014) (arguing that "copyright infringement is different from other types of property theft" and "imposing long prison sentences on criminal copyright infringers does not fit into any of the theories for imprisonment").

The PSR also illustrates that the loss amount is speculative in nature, as its calculation is derived from the *potential possibility* that corporations *could have* lost profits. Probation opines that the companies "**potentially** had diminished profits because the defendant's customers **may have** purchased the defendant's products as opposed to legitimate products." *Id.* Yet, since Mr. Kleyla sold his goods at a discounted rate, (PSR at ¶ 14-15), it is impossible to tell whether his customers would have actually purchased the legitimate products if they had to pay the full amount.

Furthermore, the amount of loss, speculative as it is, represents an infinitesimal sliver of the net worth of such giant companies as Nike, Adidas, and Reebok. Mr. Kleyla does not seek to minimize the societal harm wrought by counterfeiting. It is noteworthy, however, that the victims in this case were among the largest names in sports apparel, companies whose *daily* profits eclipse the loss amount in this case by a staggering margin. *See*, *e.g.*, NIKE, Inc. Reports Fiscal 2017 Fourth Quarter and Full Year Results, *available at* https://news.nike.com/news/nike-inc-reports-fiscal-2017-fourth-quarter-and-full-

year-results (last visited August 13, 2018) ("Fourth quarter revenues up 5 percent to *$8.7 billion*").  It can hardly be said that William Kleyla represents a serious threat to the economic viability of these companies, who apparently could not be bothered to respond to inquiries regarding restitution.  (PSR at ¶ 19).

Furthermore, due to the ever-increasing push for more severe punishment of economic crimes under § 2B1.1, the "average guideline minimum has increased steadily, from under twenty months to over thirty months."  Frank O. Bowman, III, *Dead Law Walking: The Surprising Tenacity of the Federal Sentencing Guidelines*, 51 HOUSTON L. REV. 1227, 1251 (2014).  However, federal judges have increasingly rejected these guidelines recommendations.  *Id.*; *see also* United States Sentencing Commission, *Quick Facts: Theft, Property Destruction, and Fraud Offenses,* Fiscal Year 2016, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY16.pdf (last visited August 15, 2018).

As noted by the Sentencing Commission in 2016, the rate of non-government sponsored downward departures in cases under § 2B1.1 "steadily increased" during the preceding five years from 25.3% in 2012 to 28.8% in 2016.  Sentencing Commission, *Quick Facts*, *supra*, at 1.  These offenders received an average reduction of 55.2% during that five-year time-period.  *Id.*  Government-sponsored downward departures were granted in another 21-25% of the cases, with even greater

sentence reductions of between 62.5% and 59.9% of the guidelines recommendation. In sum, district courts rejected the guidelines recommendation under § 2B1.1 to such a resounding extent that by 2016 *over half* of the defendants sentenced under this provision received downward departures.  *Id.*  This rejection of the recommended sentences under § 2B1.1 reflects widespread judicial disagreement with the harsh sentences called for under this provision.

Professor Bowman, who was an architect of the loss amount guidelines under § 2B1.1, describes this as the "judiciary's revolt" against this guideline provision. Frank O. Bowman, III, *Dead Law Walking*, *supra*, at 1151.  There are sound reasons for this revolt.  First, in the wake of *Booker*, sentencing courts have been vested with the power to vary from the guidelines "based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Spears v. United States*, 129 S.Ct. 840, 843 (2009) (emphasis added).

Second, and relatedly, sentencing courts have increasingly begun to recognize that the arbitrary loss amount enhancements under § 2B1.1 were not the product of "empirical data and national experience," *Kimbrough v. United States*, 128 S. Ct. 558, 575 (2007), and thus have declined to strictly adhere to the guidelines' recommendations on policy grounds.  *See*, *e.g.*, *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (citing *Kimbrough*, recognizing the "unusualness" of the

10

approach of the Sentencing Commission in calculating loss amount enhancements, and finding that "remand is appropriate to permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence"); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (finding application of the loss amount guideline combined with other guidelines in securities fraud showed "travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic").

This Court should follow those well-reasoned decisions, as well as the broader judicial trend toward downward departures from the loss enhancements under U.S.S.G § 2B1.1, and grant a downward departure here because the guidelines recommendation "substantially overstates the seriousness of the offense."   U.S.S.G § 2B1.1 cmt. n. 20(c).

c) The Court should grant a downward departure because the recommended sentence does not "reflect the nature and magnitude of the pecuniary harm caused by [the] crime." U.S.S.G. § 2B5.3 cmt. Backg'd.

In general, according to the commentary to § 2B5.3, "the sentences for defendants convicted of intellectual property offenses should reflect the nature and magnitude of the pecuniary harm caused by their crimes." U.S.S.G. § 2B5.3 cmt. Backg'd. As reflected in the PSR, the magnitude of the pecuniary harm caused by Mr. Kleyla is relatively minor because "nothing was directly taken from" the

companies that sold the infringed products. (PSR at ¶ 73).  The loss amount, moreover, was based on speculative calculation of the possible profits that the various companies might have captured were it not for Mr. Kleyla's sale of counterfeit goods.  Finally, as noted above, that amount was quite small compared to the massive scope of sales that these companies generate on a daily basis.  It would run counter to the spirit of U.S.S.G. § 2B5.3, as articulated in its commentary, to impose a term of incarceration for Mr. Kleyla's conduct when his crime caused so little pecuniary harm.  Accordingly, this Court should grant a downward departure based on policy grounds and impose a sentence of probation.

d)  <u>The Factors under 18 U.S.C. § 3553(a) weigh in favor of a downward variance from the Sentencing Guidelines Range.</u>

Finally, the factors in 18 U.S.C. § 3553, most notably the need to avoid unwarranted disparities in sentencing under 18 U.S.C. § 3553(a)(6), weigh in favor of a term of probation in lieu of incarceration.  Congress has identified four "purposes" of sentencing: punishment, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a)(2). To achieve these ends, § 3553(a) requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of seven factors, including:

1.  The nature and circumstances of the offense and the history and characteristics of the defendant;

2.  The need for the sentence imposed—

a. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

b. to afford adequate deterrence to criminal conduct;

c. to protect the public from further crimes. . . ; and

d. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3. The kinds of sentences available;

4. The kinds of sentence and the sentencing range established . . .;

5. Any pertinent [Sentencing Commission] policy statement . . .;

6. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7. The need to provide restitution to any victims of the offense.

§ 3553(a)(1)-(7). Against this backdrop of factors, a variance from the advisory Guidelines is warranted in Mr. Kleyla's case.

### *The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Kleyla.*

Mr. Kleyla pled guilty to a serious crime, and he accepts responsibility for his mistakes. This Court should, and indeed must, consider the nature of Mr. Kleyla's offense. However, the Court must also consider his personal history and characteristics. As Judge Rakoff noted in *United States v. Adelson*, 441 F.Supp. 2d 506 (S.D.N.Y. 2006), the importance of considering a defendant's redeeming

characteristics reaches its zenith at the moment the court determines the sentence to be imposed:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'

*Id.* at 513–14.

Mr. Kleyla is a loving father and husband who has touched the lives of many individuals in his community. (*See* Letters, hereto attached as Composite Exhibit A). After receiving a degree in zoology from Indiana University, Mr. Kleyla raised two loving children who have remained steadfast in their support for their father, notwithstanding the humiliation these criminal proceedings have caused him. (PSR at ¶ 43-44). Mr. Kleyla and his daughter have always enjoyed a "strong bond," and the two speak on a daily basis. (PSR at ¶ 44); Exhibit A at 2.

Mr. Kleyla's brother-in-law, Dan Lewis, describes him as "loving, logical and loyal." Exhibit A at 4. Mr. Kleyla stepped up to take care of Mr. Lewis's house and business when Lewis's wife contracted cancer. *Id.* If it were not for Mr. Kleyla, their family would have been "unable to function." *Id.* Further evidence of Mr. Kleyla's care and compassion for his family can be found in his dedication to his

aging in-laws, with whom Mr. Kleyla and his wife reside.  (PSR at ¶ 45).

The letters in Exhibit A also demonstrate Mr. Kleyla's longstanding commitment to the betterment of his community.  Tyler Clement recounted how Mr. Kleyla took him "under his wing" when he lost his father at a young age.  Exhibit A at 5.  Mr. Clement calls Mr. Kleyla the "prime example of what a man should be: kind-hearted, hard-working, diligent, respectful and loving."  *Id.*  Over the years, Mr. Kleyla has volunteered to coach sports at his local YMCA.  Exhibit A at 8.  Mr. Kleyla also enriched the lives of his co-workers in the film industry, including one individual who said Mr. Kleyla made him feel like a son and took care of his mother when she happened to visit the set.  Exhibit A at 3.

Mr. Kleyla, moreover, has demonstrated that he can be a productive and law-abiding citizen if this Court were to show him mercy.  He has always maintained gainful employment, most recently as a maintenance worker at Discovery Days Academy.  (PSR at ¶ 54).  Though his employment there will likely terminate due to his felony conviction, *id.*, the fact that Mr. Kleyla continues to work suggests that he can be an asset to society if this Court were to impose a term of probation.  Mr. Kleyla has also recently volunteered at Habitat for Humanity, which he hopes to continue.

Finally, Mr. Kleyla is a devoted husband.  He married his wife, Patricia Karen Kleyla, in 1979, and to this day the two have maintained a "great" relationship.

(PSR at ¶ 42).  Many of the letters in Exhibit A also attest to the fact that Mr. Kleyla is a devoted husband and a dedicated family man.  *See* Exhibit A at 4, 5, 6.

This Court should recognize the redeeming qualities in Mr. Kleyla's life and exercise its discretion in favor of mercy.  While the quality of mercy is an attribute that is not encompassed in the rigid mathematical matrix of the sentencing guidelines, it is an aspect of human existence that is essential to the any legitimate system of justice. As one distinguished jurist on the Eleventh Circuit Court of Appeals has noted:

> [m]y time on the trial bench was about doing justice. As for mercy, I reflect on the fact that the law gives judges considerable latitude to have mercy . . . In many judicial settings, we are a court of conscience. And in the criminal law, especially back then, in the years before the onset of guideline sentencing, mercy was dispensed on a daily basis. In the main, I was able to sleep at night.

Comments of the Honorable Gerald Bard Tjoflat, Law Day Address-Part Two, St. John's Cathedral, Jacksonville, Florida, May 1, 2005, reprinted, 11th Cir. Historical News, The Historical Society of the United States Courts in the 11th Circuit, (December 2005), at 8.

In summary, the § 3553(a) factor concerning a defendant's history and characteristics supports Mr. Kleyla's requested variance. Such a variance is warranted based on the development of his character, as well as his community and

16

familial support.  Consequently, Mr. Kleyla asks this Honorable Court to impose a variance in his case to a term of probation.

### The Need for the Sentence Imposed

The Court must impose a sentence that reflects the seriousness of the offense and promotes respect for law and also affords adequate deterrence to protect the public from similar conduct on the part of others.  18 U.S.C. § 3553(a).  Again, it is undeniable that the conduct for which Mr. Kleyla was convicted is serious.

However, a term of probation should not be viewed as a free pass.  As noted in *Gall*:  "Offenders on probation are . . . subject to several standard conditions that substantially restrict their liberty."  *Gall*, 552 U.S. at 596.  The *Gall* Court further observed as follows:

> Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual 'special conditions' imposed by the court.

*Id.*  In other words, it would be a mistake to view a term of probation as an unwarranted act of leniency.

Studies also show that there is little to no evidence that supports the notion that a harsher sentence would have any deterrent effect, particularly in white collar crimes such as this one.  *See* David Weisburd et al., *Specific Deterrence in a Sample*

*of Offenders Convicted of White Collar Crimes*, 33 CRIMINOLOGY 587 (1995); Zvi

D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative*

*Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 448-49 (2007)

("[T]here is no decisive evidence to support the conclusion that harsh sentences

actually have a general and specific deterrent effect on potential white-collar

offenders.").  Indeed, these studies demonstrate that the deterrent effect of these

ever-longer sentences for white collar crime, such as money laundering, has been

minimal.  *Id.*

Specific deterrence does not appear to be applicable in the instant case, as Mr.

Kleya has no criminal history and, at the age of 66, it would appear unlikely that he

would reoffend.  Thus, the essential question turns to the principle of general

deterrence. That is, whether a prison is necessary to deter others from committing

similar crimes.

The principle of general deterrence is based on the unsupported premise that

lengthy prison sentences deter crime. This faulty conception has resulted in the mass

incarceration of individuals in the United States.

> For the past 40 years, the United States has been engaged in a vast,
> costly social experiment. It has incarcerated a higher percentage of its
> people, and for a longer period, than any other democracy. In fact, with
> 5 percent of the world's population, the U.S. is home to 25 percent of
> its prisoners. There are five times as many people incarcerated today
> than there were in 1970. . . [The] archipelago of prisons and jails costs

more than $80 billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015), *available at* https://www.brennancenter. org/publication/what-caused-crime-decline.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"*?, 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck and Barnes' study concludes:

> there is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.

*Id*. at 1031.  Even the United States Department of Justice has agreed with the conclusion that incarcerating defendants is not an effective means of deterrence.  *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014).  In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter crime.  *See id*.

Furthermore, as noted, Mr. Kleyla poses a low risk of recidivism, which is recognized as a core concern of criminal sentencing. *See Why Recidivism Is a Core Criminal Justice Concern*, National Institute of Justice (Oct. 3, 2008) ("Recidivism is an important feature when considering the core criminal justice topics of incapacitation, specific deterrence and rehabilitation.").[1]

Despite being a core concern, the empirical evidence does not establish a relationship between sentence length and recidivism, regardless of the type of crime. *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016); *see also* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time

---

[1] Available at https://www.nij.gov/topics/corrections/recidivism/pages/core-concern.aspx (last visited April 18, 2018).

frame"). In sum, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Instead, a longer prison sentence may actually lead to a greater risk of recidivism. *See The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007). There is strong evidence that prison—by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders—leads to increased recidivism. *Id*.; *see also* Vera Instit. of Justice, *Overview of The Prison Paradox: More Incarceration Will Not Make Us Safer* (July 2017) (concluding that research shows a "weak relationship between incarceration and crime reduction, and highlights proven strategies for improving public safety that are more effective and less expensive than incarceration")

Moreover, harsh penalties do not improve the long-term outcomes of the offender. Longstanding research has found that imprisonment brings about negative individual-level changes that can harm re-integration upon release. National Research Council, *The Growth of Incarceration in the United States: Exploring*

21

*Causes and Consequences,* (Nat'l Acad. Press 2014).[2] Thus, the most effective way to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections. National Institute of Corrections, *Myths and Facts: Why Incarceration is Not the Best Way to Keep Communities Safe* (2016), *available at* https://s3.amazonaws.com/static.nicic.gov/Library/032698.pdf (last visited August 16, 2018).

For this reason, federal courts have recognized that a defendant's low risk of recidivism provides a basis for a departure in a defendant's sentence, particularly where a defendant is older, lacks any criminal history, and has strong familial ties. *See United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Urbina*, No. 06-CR-336, 2009 WL 565485, *2–3 (E.D. Wis. Mar. 5, 2009) (unpublished) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y.

---

[2] Available at https://www.nap.edu/catalog/18613/the-growth-of-incarceration-in-the-united-states-exploring-causes (last visited April 18, 2018).

2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, No. 2:04-CR-30-PS, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (unpublished) (granting variance to 57-year-old defendant because recidivism drops with age and noting that likelihood of recidivism was "very low").

Furthermore, in imposing "just punishment" for an offense, a sentencing court should not disregard the additional penalties and hardships that will accompany a felony conviction. *See* Hugh LaFollette, *Collateral Consequences of Punishment: Civil Penalties Accompanying a Formal Punishment*, 22 J. of Applied Phil., 241, 244-46 (2005) (discussing and critiquing on proportionality grounds retributivist justification of collateral consequences); Jeremy Travis, *Invisible Punishment: An Instrument of Social Exclusion, in Invisible Punishment: The Collateral Consequences of Mass Imprisonment* (Marc Mauer & Meda Chesney-Lind eds., 2002). A recent congressional report authored by the United States Government Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, *Stakeholders Views on Potential, Actions*

*to Address Collateral Consequences*, (Sept. 2017).[3] Of these 641 collateral consequences, 497 (78%) of them may last a lifetime. *See id*. at 2.

Judge Block has put the number of collateral consequences even higher, noting that there are "nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons." *United States v. Nesbeth*, 188 F. Supp. 3d 179, 185 (E.D.N.Y. 2016). According to Judge Block, the "collateral consequences of a felony conviction form a *new civil death*." *Id.* at 182 (emphasis added). "Convicted felons now suffer restrictions in broad ranging aspects of life that touch upon economic, political, and social rights." *Id.* They have "more public benefits to lose, and more professions in which a license or permit or ability to obtain a government contract is a necessity." *Id.* Judge Block concluded that "collateral consequences a convicted felon must face should be part of a sentencing judge's calculus in arriving at a just punishment." *Id.* at 198.

Mr. Kleyla trusts that this Court will recognize that the punishment for his crimes has already begun, both in the disgrace and humiliation he has already suffered during course of these criminal proceedings, in the prospect that he may be deprived of spending any extended period of time with his family while incarcerated, and in the inevitable diminution of employment prospects due to his felony

---

[3] Available at http://www.gao.gov/products/GAO-17-691.pdf (last visited April 18, 2018).

conviction. *See* Christopher Uggen, *Work as a Turning Point in the Life Course of Criminals: A Duration Model of Age, Employment and Recidivism*, American Sociological Review 65:529-46 (2000).   As such, Mr. Kleyla submits that a downward variance from the recommended guidelines sentence is warranted.

*The Kinds of Sentences Available*

As noted above, Mr. Kleyla submits that, under *Gall*, a downward variance to a term of probation is a sentence that is available to this Court.  *See also United States v. Duhon*, 541 F.3d 391, 394 (5th Cir. 2008) (in a child pornography case, affirming the substantive reasonableness of five-year probationary sentence where the Guidelines range was 15 to 21 months, despite prohibition against probationary sentences under § 5B1.1, comment n.2); *United States v. Autrey*, 555 F.3d 864 (9th Cir. 2009) (in a child pornography case, affirming five-year probationary sentence where the Guidelines range was 41 to 51 months).

*The Need to Avoid Unwarranted Sentencing Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct.*

The Court could grant Mr. Kleyla a downward variance under 18 U.S.C. § 3553(a)(6), which requires the Court to consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   As noted, there is a marked trend toward granting downward departures in cases of economic crime that employ the loss table contained in U.S.S.G § 2B1.1.

In addition, a review of similar cases from across the country reveals that a guidelines sentence would produce an unwarranted disparity of sentences among similarly situated defendants. For instance, in a far more egregious case out of the United States District for the District of Oregon, *United States v. Pepion*, Case No. 3:17-cr-00224 (D. Or.), the defendant sold some $2.6 million worth of counterfeit Nike shoes, but was sentenced to only four months of incarceration to be followed by three years of supervised release. *United States v. James Pepion*, Case No. 3:17-cr-00224 (D. Or. 2018) (Doc. 24, Sentencing Memorandum of the United States; Doc. 30, Judgment).

In another comparable case from the United States District Court for the District of Nebraska, a woman who trafficked and possessed over 1,000 counterfeit items, such as Coach and Kate Spade purses, received a sentence of five years of probation. *United States v. Deborah Pittman*, 4:12-cr-03028-JMG-CRZ (D. Neb. 2012) (Doc. 10, Plea Agreement; Doc. 26, Judgment). Similarly, in *United States v. Joshua D. Korb*, 6:17-cr-00343 (D.S.C.), a case originating out of the United States District Court for the District of South Carolina, the defendant was held responsible for $4,695,988.73 in restitution for trafficking in counterfeit NFL goods, yet was sentenced to only five years of probation. *United States v. Joshua D. Korb*, 6:17-cr-00343 (D.S.C. 2017) (Doc. 31, Judgment)

More recently, in another far more egregious case arising out of this district,

*United States v. Nadim Afif El-Kareh*, Case 8:16-cr-00526-MSS-AAS (M.D. Fla. 2018), the defendant trafficked in $488,918.80 of counterfeit goods over a three-year time-period and faced a guidelines range of 33-41 months, but Judge Scriven imposed a sentence of one year and one day of incarceration to be followed by 36 months of supervised release.  *See United States v. Nadim Afif El-Kareh*, Case 8:16-cr-00526-MSS-AAS (Doc. 54, Sentencing Memorandum of Gov't; Doc. 56, Judgment).

Mr. Kleyla submits that it would be highly inequitable, given the facts and circumstances of this case, if he were to receive a more severe sentence than the defendant in *Pepion*, who took in $2.6 million through the sale of counterfeit goods, but received only a four-month term of incarceration, or the defendant in *El-Kareh*, whose wide-ranging counterfeiting scheme was responsible for some three times the amount of money at issue here, but who was sentenced to one year and one day of incarceration.  Instead, the just result would be to impose a sentence in line with that received by Deborah Pittman or Joshua Korb, both of whom are similarly-situated defendants who received terms of five years of probation.

Accordingly, Mr. Kleyla asks that this Court consider a downward variance to a term of probation so as to diminish any disparity between his sentence and the sentence of other similarly-situated defendants.

## IV.   **CONCLUSION**

Based on the foregoing, Mr. Kleyla respectfully asks this Court for leniency and discretion in fashioning a sentence that is not greater than that necessary to punish the conduct at issue in this case.

DATED this 22nd day of August, 2018.

Respectfully submitted,

*/s/ Janet E. Johnson*
Janet Ellen Johnson
Janet E. Johnson, PA
3219 Atlantic Blvd
Jacksonville, FL 32207
904-634-8991
Fax: 904-634-8998
janet@janetejohnsonlaw.com
*Counsel for Defendant*

*/s/ Andrew B. Greenlee*
Andrew B. Greenlee, Esq.
Andrew B. Greenlee, P.A.
Florida Bar No. 96365
401 E. 1st St., Unit 261
Sanford, Florida 32772
407.808.6411
andrew@andrewgreenleelaw.com
*Counsel for Defendant*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the Government.

*<u>/s/ Janet E. Johnson</u>*
Janet Ellen Johnson
